UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Darren Williams, Jennifer Gannon, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>- against -<br><br>Molson Coors Beverage Company USA LLC,<br><br>Defendant | 3:21-cv-50207<br><br>First Amended Class Action Complaint<br><br>Jury Trial Demanded |

Plaintiffs allege upon information and belief, except for allegations pertaining to plaintiffs, which are based on personal knowledge:

1. Molson Coors Beverage Company USA LLC ("defendant") manufactures, labels and sells "hard seltzer" "With Antioxidant Vitamin C" under the Vizzy brand ("Product").

2. The Pineapple Mango version states, "Vizzy Hard Seltzer," "Hint of Pineapple Mango," and "With Antioxidant Vitamin C From Acerola Superfruit."



3. The front panel of a twelve-pack states, "VIZZY HARD SELTZER WITH ANTIOXIDANT VITAMIN C FROM ACEROLA SUPERFRUIT."



4. One ad states, "ANOTHER HARD SELTZER? YEAH, BUT WE'VE GOT ANTIOXIDANT VITAMIN C."



5. Another ad highlights that the Product is the "FIRST HARD SELTZER MADE WITH ANTIOXIDANT VITAMIN C FROM ACEROLA SUPERFRUIT."



6. In one ad, the Product is described as "THE ONLY HARD SELTZER WITH ANTIOXIDANT VITAMIN C."



7. In encouraging consumers to purchase Vizzy over its competitors, the advertisements state, "WHEN IN DOUBT, ALWAYS CHOOSE C. VIZZY HARD SELTZER WITH ANTIOXIDANT VITAMIN C FROM ACEROLA SUPERFRUIT."

3



8. The Product's Vitamin C content is promoted alongside pictures of fresh fruit, which give consumers the impression the Product is a nutritionally-equivalent source of the nutrients found in these fruits.



4

9. The Product's Nutrition Facts confirm it contains Vitamin C, at 18 mg or twenty percent of the recommended daily value ("RDV").

**Nutrition Facts**
Serving size 1 can

Amount per serving
**Calories 100**

| | % Daily Value |
|---|---|
| **Total Fat** 0g | 0% |
| **Sodium** 30mg | 1% |
| **Total Carbohydrate** 2g | 1% |
| Total Sugars 1g | |
| Includes <1g Added Sugars | 2% |
| **Protein** 0g | |
| Iron 0.4mg 2% • Vit C 18mg 20% | |

Not a significant source of saturated fat, trans fat, cholesterol, dietary fiber, vitamin D, calcium and potassium.

10. The ingredient list confirms that the dried acerola juice is used as the source of the Product's vitamin C.

**INGREDIENTS:** SPARKLING WATER, CANE SUGAR, NATURAL FLAVOR, PINEAPPLE JUICE CONCENTRATE, CITRIC ACID, SODIUM CITRATE AND DRIED ACEROLA CHERRY JUICE

I. "With Vitamin C" is a Prohibited and Misleading Nutrient Content Claim because "With" is a Prohibited Synonym

11. Congress required that the FDA develop and implement nutrient content claims to

5

prevent consumers from being misled by the endless terms and descriptors appearing on foods.[1]

12. The words used in connection with a nutrient tell consumers how much of that nutrient the food or beverage will have.

13. To say that a food or beverage is a "good source" of a nutrient means it has between ten and nineteen percent of the Recommended Daily Intake ("RDI") or Daily Reference Value ("DRV"). 21 C.F.R. § 101.54(c)(1).

14. The terms permitted to tell consumers this are limited to "good source," and its authorized synonyms, "contains," and "provides." 21 C.F.R. § 101.54(c)(1).

15. Synonyms which are not authorized are prohibited from being used in a nutrient content claim.

16. The reason is to prevent nutrient content claims which are or can be misleading.

17. If a company could escape the reach of the regulations by use of a thesaurus, consumers would be misled.

18. The Product's statement, "With Vitamin C," is similar to a "good source" claim, because "with" has a similar definition to "contains."

19. However, "with" is not an authorized synonym for "contains," which means its use is prohibited.

II. "With Vitamin C" is Misleading because it Implies Alcohol Consumption is a Valid Way to Obtain Nutrients

20. The terms "antioxidant [Vitamin C]" and "superfruit [Acerola]" give the impression the Product is a healthful and nutritious source of vitamin C.

---

[1] Illinois incorporates the federal food labeling regulations in the Illinois Food, Drug and Cosmetic Act ("IFDCA") and its parallel regulations. See 410 ILCS 620/1, *et seq.*

21. Even though the Product contains twenty percent of the RDI of vitamin C per serving, it is necessary to consume an alcoholic beverage to get this amount of vitamin C.

22. The emphasis on vitamin C and "superfruit" acerola suggest the Product is "a healthful source of nutrients, obscuring the fact that alcoholic beverages provide empty calories, are associated with serious health conditions, and can impair the body's metabolism of nutrients."[2]

23. The Product's nutrient content claim is contrary to the FDA's fortification policy, which prohibits addition of nutrients to foods such as carbonated and alcoholic beverages.

24. The Product's nutrient content claim is contrary to the 2020-2025 Dietary Guidelines for Americans ("DGA"), which encourages limitation of alcoholic beverages for reasons including limitation of calorie intake.

25. The DGA also state that "alcoholic beverages are 'not a component of the USDA Dietary Patterns.'"[3]

26. By promoting the Product as containing a significant amount of vitamin C, consumers are misled about the nutritional properties of alcoholic beverages.

27. The DGA encourage consumers to select "healthful sources of nutrients as part of a well-rounded diet" instead of meeting vitamin-intake guidelines through consumption of otherwise nutritionally-harmful foods and beverages.

28. Evidence suggests that even drinking *within* recommended limits may increase the overall risk of death from various causes, such as from several types of cancer and some forms of cardiovascular disease.

29. Over many years, consumption of excess alcohol can impair the body's ability to digest and utilize nutrients.

---

[2] CSPI, Vizzy Enforcement Letter, Mar. 15, 2021.
[3] *Id.* at 3.

30. Beyond excess calories, alcohol consumption is associated with a range of negative health outcomes.

31. Above average alcohol consumption is associated with an increased risk of death from all causes compared with lower average alcohol consumption.

32. Misuse of alcohol or consumption in amounts greater than recommendations increases risk of conditions such as liver disease, cardiovascular disease, injuries, and alcohol addiction and dependency.

33. Claims on alcoholic beverages based on added nutrients misleadingly obscure alcohol's harmful effects on health.

34. Excess alcohol consumption, over the long-term, impairs the body's ability to digest and utilize nutrients.

35. Ethyl alcohol [or ethanol], the base alcohol in alcoholic drinks, contains seven calories per gram.

36. In 2004, the National Institute on Alcohol Abuse and Alcoholism (NIAAA) wrote:

> Alcoholic beverages primarily consist of water, pure alcohol (chemically known as ethanol), and variable amounts of sugars (i.e., carbohydrates); their content of other nutrients (e.g., protein, vitamins, or minerals) is usually negligible. (Because they provide almost no nutrients, alcoholic beverages are considered "empty calories").

37. Since alcoholic beverages "supply calories but few nutrients," the 2020-2025 Dietary Guidelines for Americans (DGA) encourages "[a]dults who choose to drink . . . to limit daily intakes . . . so as not to exceed daily calorie limits," and cautions that, in general, "drinking less is better for health than drinking more."[4]

38. However, alcoholic beverages account for the additional calories consumed *after* "meeting food group recommendations in nutrient-dense forms."

---

[4] CSPI, Letter to FDA re: Enforcement Action on Vizzy Hard Seltzer, Mar. 15, 2021.

8

39. According to CSPI, "claims such as 'made with antioxidant vitamin C' convey healthfulness and are misleading on alcoholic beverages given their empty calories, association with serious health conditions, and anti-nutrient properties."

40. The addition of nutrients to foods ("fortification") is limited to instances where a balanced diet may not provide the necessary amount of specific nutrients.

41. Fortification of foods is not intended as a replacement for consumption of a balanced and healthy diet.

42. Fortification of foods can create a false impression that particular foods are a nutritionally superior choice, which can cause a dietary imbalance and mislead consumers.

43. Fortification of foods without any rationale can mislead consumers to (1) believing such fortification is necessary, (2) consume more of the fortified foods, and (3) consume less non-fortified foods, which are likely more nutritionally appropriate.

44. Fortification of snack foods and carbonated beverages is prohibited because these categories are (1) often high in sugar and empty calories, (2) not nutrient-dense, and (3) not intended to be significant parts of balanced diets.

45. Alcoholic beverages, like Vizzy Hard Seltzer, are carbonated beverages, are not nutrient dense and it is harmful to promote consumption of products with these qualities.

III. Conclusion

46. The Product contains other representations which are false, deceptive and misleading, including that it has a "hint" of real mango.

47. While pineapple juice is listed on the ingredient list, mango is not.

48. This means that any mango is part of the added flavoring and is not present beyond a negligible amount.

49. Reasonable consumers must and do rely on a company to honestly identify and describe the components and features of the Product, relative to itself and other comparable products.

50. Defendant sold more of the Product and at a higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

51. Had Plaintiffs and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

52. Plaintiffs paid more for the Product based on the representations than they would have otherwise paid.

53. As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than $15.99 for a pack of twelve 12 OZ cans, excluding tax, higher than similar products represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## Jurisdiction and Venue

54. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

55. Plaintiff Jennifer Gannon is a citizen of New York.

56. Plaintiff Darren Williams is a citizen of Illinois.

57. Defendant Molson Coors Beverage Company USA LLC is a Delaware limited liability company with a principal place of business in Cook County, Chicago, Illinois.

58. The principal place of business does not impact a limited liability company's citizenship for the purposes for diversity jurisdiction. *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998).

59. A limited liability company's citizenship includes every state of which its managers or members are citizens. *Corbin v. Fred Weber, Inc.*, No. 3: 21-CV-275-NJR (S.D. Ill. June 14, 2021) citing *Copeland v. Penske Logistics, LLC*, 675 F.3d 1040, 1043 (7th Cir. 2012).

60. Based on information obtained from the website of the Illinois Secretary of State, Defendant is managed by five members: E. Lee Reichert, Gavin Hattersley, Tracey Joubert, Preston McGlory, and Gregory Tierney.

61. All of Defendant's members are listed as having an address of 3939 W Highland Boulevard Milwaukee, Wisconsin, 53208.

62. This is the address of Defendant's parent company, Molson Coors Beverage Company.

63. Based upon counsel's investigation, at least one of the members of Defendant, Gavin Hattersley, is a citizen of Wisconsin:

> Gavin Hattersley, chief executive officer of Molson Coors Brewing Co., has purchased a home in the Milwaukee area, which will become his permanent residence.[5]

64. Therefore, at least one member of Defendant has a citizenship which is diverse from one plaintiff in this action. 28 U.S.C. § 1332(d)(2)(A).

65. Upon information and belief, sales of the Product and any available statutory and other monetary damages, exceed $5 million during the applicable statutes of limitations, exclusive of interest and costs.

66. Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred here – the purchase of plaintiff Williams and his experiences identified here.

Parties

---

[5] Alex Zank, Molson Coors CEO moving to Milwaukee area, Nov. 18, 2020.

67. Plaintiff Jennifer Gannon is a citizen of Mahopac, Putnam County, New York.

68. Plaintiff Darren Williams is a citizen of Rockford, Winnebago County, Illinois.

69. Defendant Molson Coors Beverage Company USA LLC is a Delaware limited liability company with a principal place of business in Cook County, Chicago, Illinois.

70. Defendant's managing members are citizens of Wisconsin.

71. Defendant is a subsidiary of Molson Coors Beverage Company, which recently relocated from Colorado to Wisconsin.

72. The website of the Colorado Secretary of State and official documents filed with regulatory authorities listed the headquarters of Molson Coors Beverage Company as Colorado at the time the initial complaint was filed.

73. Molson Coors Beverage Company is one of the largest producers of alcoholic beverages in the world.

74. Defendant is the custodian of several of the most respected brands in this field, including Coors and Molson.

75. Vizzy Hard Seltzer is manufactured, labeled, marketed and sold by Molson Coors Beverage Company USA LLC.

76. Vizzy Hard Seltzer was introduced to capitalize on growing consumer demand for "hard seltzer," which are increasingly formulated and marketed to appear as healthy "fruit" beverages, like juice or a low-calorie seltzer.

77. Defendant's vast marketing abilities realized that to drive sales, it could further bring consumers to consume hard seltzer by the addition of "healthful" qualities, such as the addition of vitamins and nutrients.

78. Plaintiff Gannon purchased the Product on at least one occasion within the statutes of limitations for each cause of action, including between February and March 2021, at locations including Stop and Shop Supermarket, 80 Birdsall Road, Baldwin Place, New York, 10505.

79. Plaintiff Williams purchased the Product on at least one occasion within the statutes of limitations for each cause of action, including between April and May 2021, at locations including Target, 6560 East State Street Rockford IL 61108.

80. Plaintiffs bought and consumed the Product knowing the negative effects of alcoholic beverages but believed the addition of nutrients – vitamin C – made up for any downside.

81. The Product was worth less than what Plaintiffs paid and they would not have paid as much absent Defendant's false and misleading statements and omissions.

82. Plaintiffs paid more for the Product than they would have paid otherwise.

83. Plaintiffs intend to, seek to, and will purchase the Product again when they can do so with the assurance that Product's representations about its components, ingredients and qualities are consistent with its representations, i.e., the Product no longer misleadingly touts its health benefits, such that a false impression is created.

## Class Allegations

84. The class will consist of all purchasers of the Product who reside in New York and Illinois during the applicable statutes of limitations.

85. Plaintiffs seek class-wide injunctive relief based on Rule 23(b) in addition to a monetary relief class.

86. Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiffs and class members are entitled to damages.

87. Plaintiffs' claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

88. Plaintiffs are adequate representative because their interests do not conflict with other members.

89. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

90. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

91. Plaintiffs' counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

92. Plaintiffs seek class-wide injunctive relief because the practices continue.

New York General Business Law ("GBL") §§ 349-350 and
Illinois Consumer Fraud and Deceptive Business Practices Act
("ICFA"), 815 ILCS 505/1, et seq.

(Consumer Protection Statutes)

93. Plaintiffs incorporate by reference all preceding paragraphs.

94. Plaintiffs and class members bought the Product because they believed, based on the representations, that alcoholic beverages could be healthful sources of nutrients.

95. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

96. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

97. Plaintiffs relied on the representations.

98. Plaintiffs and class members would not have purchased the Product or paid as much

14

if the true facts had been known, suffering damages.

<u>Breaches of Express Warranty,
Implied Warranty of Merchantability and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.</u>

99. The Product was manufactured, labeled and sold by defendant and expressly and impliedly warranted to plaintiffs and class members that the nutrients it contained outweighed the negative aspects of alcoholic beverages, such as excess calories and increased risk of ailments.

100. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

101. This duty is based on Defendant's outsized role in the market for this type of Product.

102. Plaintiffs provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

103. Defendant received notice and should have been aware of these issues due to complaints by regulators, competitors, consumers, and public health interest groups, including the Center for Science in the Public Interest ("CSPI"), to its main offices or that were received in its main offices.

104. The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable because they were not fit to pass in the trade as advertised.

105. Plaintiffs and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

106. Defendant had a duty to truthfully represent the Product, which it breached.

107. This duty is based on defendant's position, holding itself out as having special knowledge and experience this area – a trusted brewer of alcoholic beverages.

15

108. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant.

109. Plaintiffs reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchases of the Product.

110. Plaintiffs and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Fraud

111. Defendant misrepresented and/or omitted the attributes and qualities of the Product.

112. Defendant's fraudulent intent is evinced by its knowledge that alcoholic beverage cannot and should not serve as healthful sources of nutrients, and their consumption should be limited, not encouraged.

### Unjust Enrichment

113. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiffs and class members, who seek restitution and disgorgement of inequitably obtained profits.

### Jury Demand and Prayer for Relief

Plaintiffs demand a jury trial on all issues.

**WHEREFORE**, Plaintiffs pray for judgment:

1. Declaring this a proper class action, certifying plaintiffs as representatives and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiffs' attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated: July 30, 2021

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
60 Cuttermill Rd Ste 409
Great Neck NY 11021-3104
Tel: (516) 268-7080
Fax: (516) 234-7800
spencer@spencersheehan.com